# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

**CLINTON BLAYDE, JR.,**

       **Plaintiff,**

v.                                **No.: 2:08-cv-02798-BBD-cgc**

**HARRAH'S ENTERTAINMENT, INC., and**
**HARRAH'S OPERATING COMPANY, INC.,**

       **Defendants.**

---

## MEMORANDUM OPINION AND ORDER

---

This matter came before the Court for a non-jury trial, which was held on September 27-28, 2010. Plaintiff Clinton Blayde ("Plaintiff") brings a claim of age discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA") against Defendants Harrah's Entertainment, Inc. ("HET") and Harrah's Operating Company, Inc. ("HOC") (collectively "Defendants"). After reviewing the parties' proposed findings of fact and conclusions of law, hearing the testimony of the witnesses called by each party,

weighing the credibility of those witnesses, reviewing the exhibits, and considering applicable case law and Rules, the Court makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT[1]

Plaintiff began his employment at the Grand Casino and Hotel ("the Grand") in Robinsonville, Mississippi on September 11, 2000.[2]  (Tr. 15:1) Prior to working at the Grand, Plaintiff worked at Bally's Casino for almost five (5) years.  (Tr. 16:8)  Plaintiff began his employment at the Grand as a slot supervisor.  (Tr.15:24-16:1)  In January 2001, he was promoted to assistant shift manager, and in July 2002 he was promoted again to shift manager of slot operations.  (Tr. 16:4-12)  Until early 2007, Plaintiff received satisfactory to above-satisfactory performance reviews and annual merit increases in his salary.  (Tr.

---

[1]On November 23, 2010, Plaintiff filed a Motion to Strike the Declarations of James T. Evans, III ("Evans") (D.E. #111) on which Defendants relied in their proposed Findings of Fact and Conclusions of Law.  (D.E. #109)  Defendants filed a response in opposition on December 1, 2010.  (D.E. #112)  Evans did not testify at trial, nor were his declarations admitted into evidence as exhibits.  Defendants argue that the Court should consider the declarations nonetheless because, at the close of Plaintiff's proof, Defendants renewed their earlier filed motions for summary judgment to which the declarations were attached.  However, Defendants' motion brought at the close of Plaintiff's proof was a motion for judgment on partial findings.  Indeed, Defendants' attorney cited Federal Rule of Civil Procedure 52(c) governing judgments on partial findings when he brought the motion.  (Tr. 242:5-8)  When ruling on a Rule 52(c) motion, the Court considers only the proof presented at trial.  Plaintiff's motion to strike is therefore **GRANTED**, and the Court disregards the content of Evans' declarations for purposes of these findings of fact.

[2]Sometime within the past few years, the name of this property changed to "Harrah's Casino and Hotel."  (Tr. 387:13-388:1)

18:23-19:5)

The parties dispute whether Defendants were Plaintiff's employers during the time that he worked at the Grand.  Evidence was presented that in June 2005, Defendants acquired Caesar's Entertainment, Inc. ("Caesar's"), Caesar's subsidiary Grand Casinos, Inc. ("GCI"), and GCI's subsidiary BLD, which directly owned the Grand.  (Tr. 388:13-389:1)  At a shift managers' meeting in June of the following year, Plaintiff was informed that "Harrah's" had acquired the Grand and that he was "now working for Harrah's."  (Tr. 19:25-20:25)  Shortly after Defendants acquired the Grand, Plaintiff received an HOC Employee Handbook, and Plaintiff's 2007 W-2 lists HOC as his employer.  (P-11; P-5; Tr. 21:4-16; 23:15-18)

Plaintiff testified, moreover, that he was not in communication with BLD, nor did he consider BLD to be his employer.  (Tr. 23:9-14)  Although Tammy Young ("Young"), the Grand's human resources manager, testified that the employees at the Grand worked for "the property," which did business as "BL Development," she admitted on cross-examination that her paychecks were made out to her in the name of "Harrah's," that HOC issued the Grand's employee handbook, that BLD did not issue an employee handbook, and that the human resources office at the Grand was not in communication with BLD.  (Tr. 422:2-427:22)  Plaintiff also testified that Defendants had at least twenty (20) employees working for them at the Grand on any given day.  (Tr. 24:8-9)  Likewise, Young testified that approximately 2,400 employees worked

at the Grand in early 2007.  (Tr. 39:7)

In or around October 2006, employees at the Grand were asked for the first time to complete Supervisory Feedback Surveys ("SFS") evaluating the supervisors to whom they directly reported.  (Tr. 397:2-14; 393:25-394:25)  The SFS form identified the employees completing the SFS by an employee code and identified the supervisor being evaluated by his or her name. (Tr. 396:8-13; 397:1) Upon completion, the SFS forms were transmitted to an outside, third party that assigned a score to each supervisor and returned the data to the Grand's human resources department for review.  (Tr. 397:15-398:1; 398:2-11)  The minimum acceptable score on the 2006 SFS was purported to be 3.5.  (Tr. 398:12-399:1) Plaintiff scored 3.31.  (Tr. 92:23-25)  Thus, on February 15, 2007, Plaintiff received an unsatisfactory performance evaluation for the first time in his over six (6) years of employment with the Grand.  (Tr. 24:11-22)

As a result of his SFS score, Plaintiff was placed on a ninety (90) day Action Plan. (Tr. 258:1-2; 258:21-25) Plaintiff was presented with his Action Plan on February 24, 2007, at the time he received his 2006 Performance Appraisal Review.  (Id.)  Plaintiff's review was presided over by Darrell Pilant ("Pilant"), the Grand's vice-president of operations, and Brad Hirsch, the director of slots.  (Id.) Hirsch had begun working at the Grand in January 2007, but he and Plaintiff were introduced for the first time during Plaintiff's review.  (Tr. 256:10-

16; 28:22-29:1)  As the director of slots, Hirsch was Plaintiff's direct supervisor and was also responsible for determining the content of Plaintiff's Action Plan and supervising Plaintiff's progress on the Action Plan.  (Tr. 256:2-21; 258:8-15; 229:4-8; 414:4-6)

Plaintiff's Action Plan required that he seek feedback regarding his performance from his direct reports and other supervisors and that he develop specific action plan items based on the feedback he received.[3]  (Tr. 266:20-268:1; Ex. P-2)  Plaintiff testified that he met this requirement in accordance with the time line set out in his Action Plan.  (Tr. 33:1-38:19)  Hirsch testified, however, that Plaintiff failed to develop specific action plan items.  (Tr. 267:11-18)  On April 24, 2007, two (2) months after Plaintiff received the Action Plan, Hirsch presented Plaintiff with another document entitled "Clint Blayde's Specific Action Plan Items" ("the Specific Action Plan").  (Tr. 105:2-106:4; Ex. E)  At trial, Hirsch maintained that he developed the specific action plan items because Plaintiff failed to develop them himself.  (Tr. 269:11-270:19).  The Specific Action Plan outlined three projects that were not specifically enumerated in Plaintiff's original Action Plan.  (Ex. E)

First, Plaintiff was required to design a departmental communication board.  (Ex. E)

_____

[3]Plaintiff's Action Plan also stated that he had communication problems with the two other slot shift managers, Georgia Williams ("Williams") and Pennie Bedford ("Bedford").  (Ex. P-2).  Plaintiff testified that he spoke to Williams and Bedford and that they told him no such problems existed.  (Tr. 36:3-10)  Williams also testified at trial that she never had communication problems with Plaintiff.  (Tr. 188:15-189:17)

Plaintiff testified that he did not possess the skills to design a communication board, that his job did not ordinarily require those types of skills, and that projects of this nature were typically assigned to the Grand's engineering department. (Tr. 47:17-51:13) Plaintiff stated that he nonetheless attempted to design the communication board and submitted several detailed designs to Hirsch. (Tr. 47:17-51:13) Hirsch insisted that the board needed to be drawn to scale and include more detailed information before it could be submitted to the engineering department for construction. (Tr. 47:17-51:13) Plaintiff testified that Hirsch eventually approved Plaintiff's design at a meeting of all the supervisors but informed Plaintiff after the meeting that he needed to accompany Plaintiff to the engineering department. (Tr. 47:17-51:13) Plaintiff stated that he made numerous attempts to coordinate a trip with Hirsch to the engineering department but that Hirsch did not make himself available. (Tr. 47:17-51:13)

Another slot shift manager, Georgia Williams ("Williams"), corroborated Plaintiff's testimony. Williams stated that she was present at the meeting of supervisors and witnessed Hirsch authorize Plaintiff to have the board created. (Tr. 200:9-201:5) Hirsch testified, to the contrary, that Plaintiff never completed the communication board. (Tr. 91:4-293:7) Hirsch also stated that he could not recall whether a communication board was ever installed after Plaintiff was terminated. (Tr. 366:15-367:18)

Pursuant to the Specific Action Plan, Plaintiff was also required to implement a paper-fill process whereby all of the slot machines were to be refilled with paper during Plaintiff's shift, the graveyard shift.  (Ex. E)  Plaintiff testified that completion of this project was impossible given the number of employees on his shift, the amount of time required to fill the machines with paper, and the number of machines on the floor.  (Tr. 41:19-45:21)  Plaintiff further testified that Hirsch agreed to abandon the paper-fill project because it was impossible.  At trial, however, Hirsch denied that the project could not have been completed.  (Tr. 59:20-60:5; 271:20-22; 272:25-273:2)

Finally, Plaintiff was assigned the task of placing a red card in each of the slot machines on the floor to allegedly facilitate a paper-fill process.  (Ex. E)  Plaintiff testified that he informed Hirsch that it was cost prohibitive to attain red cards because red cards could only be purchased as part of a multi-color pack.  (Tr. 45:25-46:16)  According to Plaintiff, Hirsch agreed to use white cards instead of red cards and to place white cards in only a portion of the machines on the floor.  (Tr. 142:22-143:13; 45:25-46:16)  At trial, Hirsch denied that he approved these changes to the project.  (Tr. 296:1-297:17; 299:25-300:14)

Plaintiff and Hirsch met on April 27, May 2, and May 15, 2007, to review Plaintiff's progress on his Action Plan.  (Tr. 106:22-24; Ex. F and G)  At each meeting, Hirsch

7

informed Plaintiff that he was not successfully completing his Action Plan. (Tr. 107:10-109:12; Ex. F and G). Although Plaintiff signed documents stating that he was failing to complete his Action Plan, Plaintiff explained at trial that he signed the documents only to indicate that he had met with Hirsch. (Tr. 110:1-13; Ex. F and G). Plaintiff testified that he consistently complained about the use of the Action Plan to Hirsch and requested meetings with Pilant but that his requests were never honored. (Tr. 30:2-7) Hirsch denied that Plaintiff protested the Action Plan or sought to meet with Pilant. (Tr. 259:11-260:19;273:17-19) At their last meeting, Plaintiff requested an additional thirty (30) days to complete his Action Plan, but Hirsch denied his request. (Tr. 301:8-19; 332:16-23).

Plaintiff was terminated on May 28, 2007, for allegedly failing to complete his Action Plan. (Tr. 303:6-304:6; Ex. P-5) Hirsch made the decision to terminate Plaintiff. (Tr. 415:3-5; 268:25-269:10) At trial, Hirsch testified that Plaintiff was an asset to the Grand except for his failure to complete the Action Plan. (Tr. 415:3-5; 268:25-269:10) Plaintiff was fifty-two (52) years old at the time of his termination. (Tr. 124:10-19) He was happy working at the Grand, had planned to continue working at the Grand until age sixty-five (65), and suffered no health problems that would have precluded him from doing so. (Tr. 70:2-6) Hirsch testified that he did not know Plaintiff's age and could not approximate Plaintiff's age. (Tr. 305:14-15) Plaintiff was replaced by Bill Lewis, who was forty-one

8

(41) years old at the time.[4]  (Ex. P-5; Tr. 329:9-12)

Young testified that approximately 250 supervisors received SFS scores in 2006.  (Tr. 400:1-13)   Of those 250 supervisors, Plaintiff and approximately thirty (30) other supervisors scored below the acceptable minimum. (Tr. 400:1-13) Each of these supervisors was placed on either a "Plan to Improve Area" or an "Action Plan." (Tr. 400:16-23; 412:2-4) Pursuant to a Plan to Improve Area, an employee was monitored and re-evaluated for one year. (Tr. 430:8-17) Pursuant to an Action Plan, an employee was terminated upon failure to complete the plan within the time specified. (Tr. 429:25-430:7) Young stated that an employee's initial Action Plan was to include all of the issues that the employee was expected to address. (Tr. 440:25-441:12) Of those supervisors who successfully completed their plans, Young could recall who had been placed on a Plan to Improve Area and who had been placed on an Action Plan. (Tr. 430:23-431:2) She did testify, however, that she was unaware of a time when Hirsch supervised an Action Plan that did not result in the employee's termination. (Tr. 432:7-15)

Young also testified that an employee's length of service in a particular position was

---

[4]Defendants' response to the EEOC Charge identifies the individuals who took over the positions of slot shift managers and their corresponding dates of birth as follows:  Allison Ross (date of birth 11/19/65); Chad Cochran (date of birth 4/10/71); and Bill Lewis (date of birth 10/2/65).  (Ex. P-5)  All of these individuals are younger than Plaintiff.

a factor in determining the employee's salary.  (Tr. 447:11-25)   At the time of his termination, Plaintiff was earning $55,000.00 per year or $1,057.69 per week in his position as shift manager of slot operations.  (Ex. P-9)  After his termination, Plaintiff received unemployment benefits in the amount of $183.75 per week for a period of sixteen (16) weeks. (Tr. 66:14-16; 68:14-18; 69:9-18) He also withdrew approximately $10,000.00 from his 401(k) retirement plan and used credit cards to pay bills and other living expenses until he found employment. (Tr. 66:14-16; 68:14-18; 69:9-18)

On September 18, 2007, Plaintiff obtained a position as a slot operations manager at Sam's Town Casino ("Sam's Town") performing the same type of work he had performed at the Grand.  (Tr. 17:3-6; Ex. P-10)  At the time of trial, Plaintiff had held his position at Sam's Town for three (3) years and received favorable performance evaluations and merit salary increases.  (Tr. 17:7-19:5)  His starting salary at Sam's Town was $45,000.00 per year, $10,000.00 less than he had been making at the Grand when he was terminated.  (Tr. 66:14-16; 68:14-18; 69:9-18; Ex. P-10)

The Court heard testimony from three of Plaintiff's former co-workers at the Grand: Williams, mentioned above, Josie Tam ("Tam"), and John Branson ("Branson").[5]  Williams,

---

[5]Defendants objected to the testimony of each of these witnesses on the basis of relevancy.  Each of these witnesses offered testimony tending to establish one or more elements of Plaintiff's claim:  that Defendants were Plaintiff's employers, that Plaintiff was qualified for

who was fifty-six (56) years old at the time, received a poor performance evaluation for the first time in February 2007 and was subsequently placed on a ninety (90) day Action Plan. (Tr. 184:14-20) Hirsch oversaw Williams' performance on her Action Plan. (Tr. 184:20-22) Williams was terminated in June 2007 for allegedly failing to complete her Action Plan and was replaced by a younger individual. (Tr. 184:14-20; P-5) At trial, Williams maintained that she had completed her Action Plan. (Tr. 187:10-12) Finally, Williams testified that on two occasions while Hirsch was supervising her performance on her Action Plan, he asked her if she thought her job could be performed more efficiently by a younger person. (Tr. 190:1-193:2)

Josie Tam ("Tam") was an assistant shift manager in table games. (Tr. 165:22-25) Like Plaintiff, Tam, who was fifty-three (53) years old at the time, received satisfactory to above-satisfactory performance reviews until February 2007 when she received her only poor evaluation and was placed on an Action Plan. (Tr. 166:1-167:14) Tam was placed on an Action Plan even though her SFS score was 4.732, which was above the required minimum of 3.5. (Tr. 170:5) Tam was terminated for allegedly failing to complete her Action Plan. (Tr. 172:5-16) At trial, Tam maintained that she had completed her Action

---

his position, and/or that Defendants implemented a policy after acquiring the Grand that had a discriminatory impact on individuals of a certain age. Defendants' objections are therefore overruled.

Plan. (Tr. 172:5) Tam was replaced by Chris Griffin, who was estimated to be in his mid-thirties. (Tr. 226:16-227-7)

John Branson ("Branson") was a casino shift manager in table games in 2006 and part of 2007 and Tam's supervisor in 2006. (Tr. 220:12-221:25) Branson never had any problems with Tam's performance and felt that she was a competent and loyal employee. (Tr. 222:1-8) He initially gave Tam a favorable performance evaluation in 2006. (Tr. 222:9-16) However, Branson testified that Pilant, Branson's supervisor, told Branson that pursuant to Defendants' policies and procedures a new method of evaluating employees had been implemented. (Tr. 222:17-224:16) Pilant asked Branson to change Tam's evaluation to make it less favorable so that Tam would be required to be placed on an Action Plan. (Tr. 222:17-224:16) Branson felt that his job would be in jeopardy if he did not change Tam's evaluation. (Tr. 223:14-21) In Branson's opinion, the goals and objectives of Tam's Action Plan were unrealistic. (Tr. 224:17-25)

Each of these three witnesses also corroborated Plaintiff's testimony that in June 2006 employees at the Grand were notified that "Harrah's" had acquired the Grand and that Defendants were their employers from that point forward. Specifically, Williams testified that she received an HOC Employee Handbook and that her 2006 W-2 listed HOC as her employer. (Tr. 182:23-183:21) Tam testified that she was informed of the acquisition via

12

letter on "Harrah's" letterhead, that she received a "Harrah's" handbook, and that her 2006 W-2 listed HOC as her employer. (Tr. 162:23-163:17) Branson also testified that he was informed of the acquisition via letter and that his 2006 W-2 listed HOC as his employer. (Tr. 219:16-25) Likewise, although he denied that he worked for Defendants, Hirsch listed HET as his employer on his LinkedIn page, which was admitted into evidence. (Ex. P-12) Each of Plaintiff's witnesses also stated that they had no communication with BLD, nor did they consider BLD to be their employer. (Tr. 220:4;163:10-12; 182:14-16)

## II.    PROCEDURAL HISTORY

On July 18, 2007, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (Ex. P-4) Plaintiff received a Notice of Right to Sue letter (Ex. P-3) and on November 19, 2008, filed a Complaint in this Court alleging age discrimination in violation of Title VII and the ADEA and seeking compensatory and punitive damages. (D.E. #1) Plaintiff named the following five defendants: Harrah's Tunica Corporation ("HTC"), HET, GCI, HOC, and BLD. On June 23, 2009, the Court entered an order granting HTC and BLD's motions to dismiss but denying HET and HOC's motions to dismiss. (D.E. #24) On November 16, 2009, the Court entered an order granting GCI's motion to dismiss. (D.E. #47) As a result, HET and HOC are the only remaining defendants. On September 20, 2010, the Court denied Defendants'

separate but essentially identical Motions for Summary Judgment asserting that they could not be held liable because they were neither Plaintiff's employer nor an integrated enterprise with Plaintiff's employer.  (D.E. #99).

The Court held a two-day bench trial on September 27-28, 2010.  At the close of Plaintiff's proof, Defendants moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, asserting as follows: 1) Plaintiff may not recover for age discrimination under Title VII; 2) Plaintiff failed to establish by a preponderance of the evidence that Defendants were Plaintiff's employer or an integrated enterprise with Plaintiff's employer; 3) Plaintiff failed to establish by a preponderance of the evidence that Plaintiff's age was the "but for" cause of his termination; and 4) Plaintiff is not entitled to punitive damages under the ADEA.  The Court granted Defendants' motion for judgment on partial findings on the issue of Plaintiff's inability to recover for age discrimination under Title VII and reserved rulings on the remaining motions.

## III.   CONCLUSIONS OF LAW

### A.   Employer Status

There are certain employment practices which are made unlawful by the ADEA.  See 29 U.S.C. §§ 621 et seq.  As a preliminary matter, a plaintiff bringing suit under the ADEA must demonstrate that the defendant is the plaintiff's employer.  This determination focuses

14

on whether the defendant falls under the ADEA's definition of "employer," 29 U.S.C. § 630(b), and whether an employment relationship existed between the plaintiff and the defendant. See Lilley v. BTM Corp., 958 F.2d 746, 750 (6th Cir. 1992).  Under the ADEA, "The term 'employer' means a person engaged in industry affecting commerce who has twenty [20] or more employees for each working day in each of twenty [20] or more calendar weeks in the current or preceding calendar year[.]"  29 U.S.C. § 630(b).  The determination of whether an employment relationship existed involves an examination of whether the alleged employer had the authority to make key management decisions and exercised control over the manner and means of the plaintiff's work.  Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, 612 (6th Cir. 2003).[6]

All of Plaintiff's witnesses testified that they were informed in or around June 2006 that "Harrah's" had acquired the Grand and that it was their understanding from that point forward that they were employees of Harrah's.  Likewise, Defendants' witness and employee at the Grand, Hirsch, considered himself an employee of HET as evinced by his LinkedIn page.  Accordingly, after Defendants acquired the Grand, employees received an HOC

---

[6]Although Sutherland is a Title VII case, "the provisions of the ADEA generally receive an identical interpretation to corresponding provisions of Title VII."  Lilley, 958 F.2d at 746.

Employee Handbook as well as W-2s listing HOC as their employer.[7]  Finally, Plaintiff's

testified that there were at least twenty (20) employees working for Defendants at the Grand

at the time he was terminated, and Young testified that approximately 2,400 employees

worked at the Grand in early 2007.  The Court therefore finds that Defendants meet the

definition of "employer" under the ADEA and that Plaintiff was their employee.

In so holding, the Court rejects Defendants' argument that BLD was Plaintiff's direct

employer and that the Court should therefore apply the analysis proffered in Swallows v.

Barnes & Noble Books Stores, Inc. for determining whether a parent corporation can be held

liable for the discriminatory acts of its subsidiary.  128 F.3d 990 (6th Cir. 1997).  The fact

that BLD directly owned the property where the alleged discriminatory conduct took place

does not, without more, support the conclusion that an employment relationship existed

between Plaintiff and BLD.  At trial, Plaintiff's witnesses all testified that they had no

communication with BLD and never considered BLD to be their employer.  Although Young

testified that the employees at the Grand worked for "the property," which did business as

"BL Development," she admitted on cross-examination that her paychecks were made out

---

[7]26 U.S.C.A. § 6051(a) provides that any person who is required to deduct and withhold
taxes from its employees must furnish to each employee a statement, the W-2 form, that sets
forth the amount of wages the employee earned and the amount deducted and withheld as taxes.
See Hughes v. United States, 899 F.2d 1495, 1500 (6th Cir. 1990).  26 U.S.C.A. § 6051(d)
provides that the employer must also file a duplicate of the statement with the IRS. Id.

to her in the name of "Harrah's," that HOC issued the Grand's employee handbook, that BLD did not issue an employee handbook, and that the human resources office at the Grand was not in communication with BLD.  (Tr. 422:2-427:22)  Absent evidence to support the conclusion that an employment relationship existed between Plaintiff and BLD, the Court concludes that application of the <u>Swallows</u> analysis is inappropriate in this case.

## B.   <u>Prima Facie</u> Case

To establish a violation of the ADEA, the plaintiff has only to prove that age was a determining factor in the decision to terminate.  <u>Chappell v. GTE Prod. Corp.</u>, 803 F.2d 261, 266 (6th Cir. 1986).  Plaintiff may make this showing with either direct or circumstantial evidence.[8]  <u>Geiger v. Tower Auto.</u>, 579 F.3d 614, 620 (6th Cir. 2009) (citing <u>Gross v. FBL Fin. Serv.</u>, 129 S. Ct. 2343, 2351 (2009)). In cases such as this where the plaintiff's ADEA claim is based principally on circumstantial evidence, the Sixth Circuit has employed the framework articulated in <u>McDonnell Douglas Corp. v. Green</u>.  411 U.S. 792 (1973).

---

[8]"[D]irect evidence [of discrimination] is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  <u>Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.</u>, 176 F.3d 921, 926 (6th Cir. 1999).  Unlike indirect evidence, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  <u>Johnson v. Kroger Co.</u>, 319 F.3d 858, 865 (6th Cir. 2003); <u>see also</u> <u>Grizzell v. City of Columbus</u>, 461 F.3d 711, 719 (6th Cir. 2006) (explaining that direct evidence "proves the existence of a fact without requiring an inference").

Pursuant to that framework, the plaintiff must first establish a prima facie case.  Id. at 802.

Under the ADEA, proof of a prima facie case requires a showing by a preponderance of the

evidence 1) that the plaintiff was at least forty (40) years old at the time of the alleged

discrimination, 2) that he was subjected to an adverse employment action, 3) that he was

otherwise qualified for the position, and 4) that he was replaced by a younger worker.  Tuttle

v. Metro. Gov't of Nashville, 474 F.3d 307, 317 (6th Cir. 2007); Rowan v. Lockheed Martin

Energy Sys. Inc., 360 F.3d 544, 547 (6th Cir. 2004).

Defendants concede that Plaintiff has met his prima facie case.  Plaintiff was

fifty-two (52) years old at the time of his termination and suffered an adverse

employment action in the form of his termination.  Plaintiff had been employed in the

casino industry for fourteen (14) years prior to his termination and was quickly re-

employed in essentially the same position at Sam's Town.  At the time of trial, Plaintiff

had worked at Sam's Town for over three (3) years without incident.  Finally, Plaintiff

was replaced by Bill Lewis, who was eleven (11) years younger than Plaintiff.

**C.    Legitimate, Non-Discriminatory Reason and Pretext**

Once a plaintiff has established a prima facie case, the burden shifts to the

defendant to present a legitimate, non-discriminatory reasons for the plaintiff's

termination.  See Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 142 (2000).  The

18

defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reasons are pretextual. Id. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000); Tuttle, 474 F.3d at 319 (quoting Tisdale v. Fed. Express Corp., 415 F.3d 516, 529 (6th Cir. 2005)). The Sixth Circuit has held that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).

Defendants contend that they terminated Plaintiff solely for his failure to meet the requirements of his ninety (90) day Action Plan. Young testified that when an employee was presented with an Action Plan, that plan was to include everything that the employee was responsible for completing within the set time frame. Hirsch did not

provide Plaintiff his Specific Action Plan, which outlined the major projects that Plaintiff was required to complete, until sixty (60) of the ninety (90) days allowed for completion of his original Action Plan had expired. It is also noteworthy that Young could not recall an Action Plan Hirsch had overseen that did not result in the employee's termination.

Turning to the Specific Action Plan projects, the Court finds that the communication board was outside the scope of Plaintiff's ordinary duties and was apparently unnecessary given that the project was abandoned after Plaintiff's termination. Plaintiff testified, moreover, that Hirsch approved the communication board and that the board was not installed only because Hirsch insisted that he accompany Plaintiff to the engineering department. Williams corroborated this testimony. The other two projects appear to be a means of establishing impossible standards for Plaintiff to meet. Plaintiff testified that the paper-fill project could not have been completed in accordance with Hirsch's instructions and that Hirsch agreed to change the requirements for completion of the red card project.

Also, in the same month, February 2007, Plaintiff, Williams, and Tam received poor performance evaluations and were placed on Action Plans. Tam, the youngest of these employees, was fifty-three (53) years old at the time. Young testified that age,

20

commensurate with length of employment, was a factor in determining salary, and each of these individuals was replaced by a younger person.  Comments referencing age discrimination can also be considered when assessing whether an employer's reason for terminating an employee is pretextual.  See Tuttle, 473 F.3d at 320 (quoting Talley v. Bravo Pitino Rest., 61 F.3d 1241, 1248 (6th Cir. 1995)).  Williams testified that Hirsch made comments to her on at least two separate occasions suggesting that her position should be held by a younger individual.  Plaintiff held the exact same position as Williams and was only four (4) years younger than Williams.

Finally, the evidence supporting Defendants' explanation for Plaintiff's termination consists primarily of Hirsch's testimony, and Hirsch was not a credible witness.  Notably, Hirsch testified that he did not work for Defendants even though he listed HET as his employer on his LinkedIn page.  When confronted with this inconsistency, Hirsch could not offer an explanation except to state that it was not his LinkedIn page.  This assertion was incredible given that Hirsch had already verified all of the information contained on the LinkedIn page as being accurate.  This and other inconsistencies and illogical conclusions discredit Hirsch's testimony that Plaintiff's Action Plan was intended to improve Plaintiff's performance.

**D.    Conclusion**

The proof supports the conclusion that Defendants used the requirements of an Action Plan to ensure Plaintiff's failure and that the Action Plan was a pretext for his ultimate termination.  The Action Plan provided Defendants with a vehicle to paper Plaintiff's employment file and ultimately to terminate him.  Plaintiff's termination was not in fact related to his job performance but was motivated by his age and the salary he earned as a combined result of his age and tenure.  The Court therefore finds that Plaintiff has proven by a preponderance of the evidence that Defendants' proffered reason did not actually motivate his termination and was mere pretext for an unlawful action.  Accordingly, the Court finds for Plaintiff on his age discrimination claim.

### E.    Damages

#### i.    Back Pay

Where a plaintiff proves that he was discharged because of his age in violation of the ADEA, he is entitled to recover back pay lost as a proximate result of the violation.  Wheeler v. McKinley Enters., 937 F.2d 1158, 1162 (6th Cir. 1991).  At the time of his termination on May 28, 2007, Plaintiff was making $55,000.00 per year or $1,057.69 per week.  He received unemployment benefits in the amount of $183.75 for

sixteen (16) weeks before becoming re-employed on September 18, 2007.[9]  Thus, for

the period of time in which Plaintiff was unemployed because of Defendants' violation

of the ADEA, Plaintiff is entitled to a back pay award in the amount of $16,923.04

(sixteen (16) weeks x $1,057.69 weekly salary).

Plaintiff also is entitled to back pay from the date of his re-employment until the

present.  Plaintiff's new annual salary of $45,000.00 is $10,000.00 less than his salary

in Defendants' employ, representing a weekly difference in salary of $192.30.  Plaintiff

has been re-employed approximately 164 weeks.  Plaintiff is entitled to an additional

back pay award of $31,537.20 (164 weeks x $192.30).  Plaintiff is therefore entitled

to a total combined back pay award of $48,460.24.[10]

### ii.    Front Pay

Front pay is an available form of equitable relief in ADEA actions.  <u>Roush v.</u>

---

[9]"The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing damages owed to a plaintiff by the amount of recovery the plaintiff receives from sources that are collateral to the tortfeasor." <u>Jackson v. City of Cookeville</u>, 31 F.3d 1354, 1359 (6th Cir. 1994).  Under the collateral source rule, Defendants are not entitled to offset Plaintiff's unemployment benefits.  <u>See</u> <u>Hamlin v Charter Tp. of Flint</u>, 165 F.3d 426, 435 (6th Cir. 1999).

[10]Although a plaintiff has a duty to mitigate damages, a wrongdoer carries the burden of establishing that damages were lessened or might have been lessened by the plaintiff.  <u>Jones v. Consolidated Rail Corp.</u>, 800 F.2d 590, 593-94 (6th Cir. 1986).  Defendants offered no evidence tending to show that Plaintiff failed to mitigate his damages.

<u>KFC Nat. Mgmt. Co.</u>, 10 F.3d 392, 398 (6th Cir. 1993).[11]  An award of front pay is guided by the consideration of certain factors, including available employment opportunities, the employee's work and life expectancy, the discount tables to determine the present value of future damages, and any other factors pertinent to prospective damages awards.  <u>Shore v. Fed. Express Corp.</u>, 777 F.2d 1155, 1160 (6th Cir. 1985).  In awarding front pay, the Court does not consider future pay raises, nor does it apply a discount rate.  <u>Jackson,</u> 31 F.3d at 1361.

Although Plaintiff has been employed in a new position for three (3) years, his salary  is $10,000.00 less in his new position than it was in Defendants' employ. Defendants presented no evidence that Plaintiff has intentionally limited his income. Plaintiff testified that he intended to work in his position at the Grand until age sixty-five (65) and had no health problems that would have precluded him from doing so. Plaintiff was fifty-two (52) years old at the time of his termination and is presently fifty-five (55) years old, which would entitle him to ten (10) years of front pay. Plaintiff is therefore entitled to a front pay award in the amount of $100,000.00 (ten

---

[11]The Court recognizes that reinstatement is the presumptively favored equitable remedy in ADEA actions.  <u>Id.</u>  The Sixth Circuit has held, however, that reinstatement is not appropriate in every case, including a case such as this where the plaintiff has found other work.  <u>Id.</u> Moreover, Plaintiff has not requested reinstatement, nor have Defendants presented evidence suggesting that they have offered reinstatement or that reinstatement is a viable remedy.  <u>See id.</u>

(10) years x $10,0000.00 difference in annual salary).

### iii.    Liquidated Damages[12]

29 U.S.C. § 626(b) provides that a plaintiff is entitled to recover liquidated damages for "willful" violation of the ADEA.  Liquidated damages are recoverable in an amount equal to the award of back pay.  <u>Wheeler</u>, 937 F.2d at 1164. The Sixth Circuit has held that "willful" violations of the ADEA are those that occur where "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." <u>Trans World Airlines, Inc.</u>, 469 U.S. at 128.  In such cases, an employer may avoid a liquidated damages award by showing that it had a good faith and reasonable basis for believing that its conduct was not in violation of the ADEA. <u>Id.</u> at 128 n.22

Branson testified that he was instructed to change a good performance evaluation into a poor performance evaluation for the purpose of placing Tam on an Action Plan and that he understood this instruction to be in accordance with a policy implemented by Defendants.  Plaintiff, Williams, and Tam had all worked at the casino since it

---

[12]Plaintiff's complaint seeks compensatory and punitive damages.  (D.E. #1)  Plaintiff is not entitled to recover punitive damages under the ADEA. <u>See</u> 29 U.S.C. §§ 216(b), 626(b); <u>Ahlmeyer v. Nevada Sys. of Higher Ed.</u>, 555 F.3d 1051, 1059 (9th Cir. 2009).  The Court construes Plaintiff's claim for punitive damages as a claim for liquidated damages.  <u>See</u> <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 128 (1985) ("[L]iquidated damages are punitive in nature.").

opened or shortly thereafter and were members of the protected class.  In the same month, February 2007, they received poor performance evaluations and were placed on Action Plans.  Young testified that age, commensurate with length of employment, was a factor in determining salary, and Plaintiff, Tam, and Williams were each replaced by a younger individual.  Although Hirsch testified that these actions were taken without regard to age, the Court has found that Hirsch was not a credible witness. Moreover, Williams testified that, on two occasions, Hirsch suggested that a younger person might be better suited for her job.

The preponderance of the evidence in this case, albeit circumstantial, supports the conclusion that, upon acquiring the Grand, Defendants implemented policies and procedures aimed at providing a pretext for the termination of Plaintiff and other employees who fell within the class protected by the ADEA. Plaintiff's termination appears to have been motivated, not by his performance, but by his age and his salary, which was a combined result of his age and the length of his tenure.  At a minimum, Defendants acted with  reckless disregard for whether their conduct violated the ADEA.  As such, Plaintiff is entitled to recover liquidated damages for Defendants' willful violation of the ADEA in an amount equal to his back pay award, $48,460.24.

## IV.   CONCLUSION

Based on the foregoing, the Court enters judgment for Plaintiff Clinton Blayde, Jr.  It is hereby **ORDERED** that Defendants pay to Plaintiff back pay in the amount of $48,460.24, front pay in the amount of $100,000.00, and liquidated damages in the amount of $48,460.23.   Plaintiff is entitled to a total judgment in the amount of $196,920.48.  Pursuant to 29 U.S.C. § 216(b), Plaintiff, as the prevailing party, may file a motion with the Court for attorney's fees and costs supported by proper documentation within fifteen (15) days of the entry of this order.   Defendants shall have fifteen (15) days following the filing of Plaintiff's motion to respond.   Such awards will enter by separate order.   Judgment shall be entered accordingly.

**IT IS SO ORDERED** this the 17th day of December, 2010.


s/Bernice B. Donald
**BERNICE B. DONALD**
**UNITED STATES DISTRICT JUDGE**